## NATIONAL LABOR RELATIONS BOARD v. SHENANDOAH–DIVES MINING CO.

### No. 2548.

Circuit Court of Appeals, Tenth Circuit.

Nov. 6, 1944.

Marcel Mallet-Prevost, of Washington, D. C. (Alvin J. Rockwell, Malcolm F. Halliday, and David Findling, all of Washington, D. C., on the brief), for petitioner.

Irvin Fane, of Kansas City, Mo. (Reese McCloskey, of Duranga, Colo., and William C. Lucas and Johnson, Lucas, Graves & Fane, all of Kansas City, Mo., on the brief), for respondent.

Charles J. Moynihan, of Montrose, Colo., for intervenor Silverton Miners Union, Local No. 26.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge, delivered the opinion of the court.

Petitioner, the National Labor Relations Board, instituted this action in our court seeking enforcement of its order directing the respondent, Shenandoah-Dives Mining Company,[1] to cease and desist from:

(a) Dominating or interfering with the administration of the San Juan Federation of Mine, Mill and Smelter Workers,[2] or with the formation or administration of any other organization of its employees or contributing support to the Federation or any other labor organization of its employees;

(b) Recognizing the Federation as bargaining representative of any of its employees;

(c) Giving effect to or performing its contract with the Federation or any extension, renewal, modification or supplement thereof, or any superseding contract with the federation;

(d) Discouraging membership in Silverton Miners Union No. 26 of the International Union of Mine, Mill and Smelter Workers,[3] or any other labor organization of its employees, or encouraging membership in the Federation or any other organization of its employees by refusing to reinstate any of its employees, or in any other manner discriminating in regard to hire or tenure of employment or any term or condition of employment;

(e) In any other manner interfering with, restraining or coercing its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining, or any other mutual aid or protection;

and the company shall take the following affirmative action:

(a) Withdraw all recognition from the Federation as bargaining representative of any of its employees, and disestablish the Federation as such representative;

(b) Offer to the employees listed in Appendix B to the order immediate and full reinstatement to their former or substantially equivalent positions without prejudice to their seniority and other rights and privileges;

(c) Make whole the employees named in Appendix B for any loss of pay they may have suffered by reason of the Company's discrimination in regard to their hire and tenure and conditions of employment, by payment to each of them, respectively, of a sum of money, equal to that which each would normally have earned as wages during the period from November 25, 1939, to the time of the offer of reinstatement, less his net earnings, if any, during such period;

(d) Post a notice of compliance.

Subsequent to the hearing, we remanded the case to the Board for the purpose of adducing additional evidence upon the question whether the Federation had a numerical majority of the Company's em-

---

[1] Herein called the Company.
[2] Herein called the Federation.
[3] Hereinafter called the Union.

ployees at the time it obtained recognition as the bargaining representative of the employees. Pursuant to the remand, the Board by stipulation adduced additional evidence which established that the Federation had a numerical majority of the employees in the appropriate unit at the time it was recognized. Upon remand, the Board went further and reconsidered the case upon the entire record and issued a supplemental and amended decision and order and recommendation relating to the entire case. The new order eliminated the finding that the Company interfered with the formation and administration of the Federation and dominated and supported it. The Board found, however, that the Company assisted the Federation and thereby interfered with and coerced its employees in the exercise of their rights. The Board modified its previous order so as not to require the Company to disestablish the Federation as bargaining representative, but directed it to withdraw and withhold recognition of that organization or any successor thereof until such organization shall have been certified by the Board as a representative of the employees. The Board now seeks enforcment of its modified order. The theory on which the Board reexamined the entire case upon remand does not appear. Its authority to enter the modified order is, however, not challenged.

The only question presented is whether the findings of the Board are supported by substantial evidence. The Company is engaged in mining ore at Silverton, Colorado. It employed from 240 to 250 employees other than those engaged in a supervisory capacity. Silverton Miners Union No. 26 was a labor organization affiliated with the International Union of Mine, Mill and Smelter Workers, which in turn was affiliated with the Congress of Industrial Organization. On June 1, 1938, the Company entered into a written contract with the Union recognizing it as the bargaining representative of the eligible employees. The contract was for one year and was renewable unless terminated by one of the parties giving a thirty day termination notice. On April 27, 1939, the Union submitted a new contract and requested that the Company bargain with it. On the following day the Company notified the Union of its refusal to consider any contract pending the determination of the price of silver after June, 1939. Numerous conferences were held, but no agreement was reached. On July 13, the Union, by referendum vote, authorized a strike. At least six conferences were thereafter held by the two parties, with a conciliator from the Department of Labor, but no agreement was reached and the strike went into effect. The main period of the strike lasted until about August 28, 1939.

Friction developed among the employees and a movement was started among some of them to oust the Union and form a new labor organization. In August, while the strike was in progress, William Hughes, a supervisory employee, had printed at Salt Lake City, Utah, 200 membership cards in the San Juan Federation of Mine, Mill and Smelter Workers, at the request of Charles Scheer, and delivered them to him. Scheer was opposed to the Union and active in the formation of the Federation. At about the same time, the general manager of the Company permitted the use of its hectograph for the printing of "A Striking Mucker's Last Refrain," a doggerel which depicted in an ironic vein the hardships of the strikers, and derided the Union and its efforts.

Late in August a rumor spread that an insurgent group of Union members would attempt to break the strike at the regular Union meeting to be held on the night of August 28. General Manager Chase favored this movement. He testified that, having heard that "insurrection would be attempted" and believing that the mine was "dead unless the men who sought to restore it succeeded," he hopefully drove past the Union hall while the meeting was in progress, but "seeing the street quiet, I saw no sign of encouragement." Later in the evening a considerable crowd, including Mine Foreman Hughes, Mechanical Foreman Bleich, and Shift Boss Edwards, gathered outside the Union hall. When the Union members left the hall, strife broke out, and some of the Union members were assaulted by the mob. The mob was led by Frank "Corky" Scheer.[4] June Thomas testified that she heard Foreman Hughes say to Charles Wing, an employee of the Western Power Company, "Boy, I sure picked a good one when I picked Corky Scheer. Look at him go. He is worth his weight in gold." Immediately after the

---

4 At the time of this meeting, Frank Scheer was not employed by the Company.

He was employed in September, 1939.

rioting and the ouster of the Union leaders, a group composed mostly of Union members entered the Union hall and held a special meeting. Shift Boss Edwards, who was an honorary, dues-paying member of the Union but not privileged to attend meetings or participate in Union affairs, was present. Those at the meeting voted to withdraw from the C.I.O., form a new union, and call off the strike. The meeting then adjourned.

A few minutes later another meeting was held to form the new union. Anyone interested was invited to attend. The Federation was formed at this meeting. It adopted the name and constitution which Charles Scheer had previously conceived and prepared. Scheer distributed the membership cards which Hughes had printed in Salt Lake City and delivered to him. The Federation decided to open negotiations with the Company the morning of August 29. On August 30, the Federation requested General Manager Chase to meet with its negotiation committee. Some time between September 1 and 4 it submitted its membership list to Chase, which he caused to be checked. He testified that, "We believe it showed a majority of the employees, former employees, available." An agreement was reached on September 5 and a contract recognizing the Federation as the sole bargaining representative was signed the following day.

After the recognition of the Federation by the Company, certain members of the Union returned to Silverton and demanded a return of Union property from the Federation. The committee first went to the sheriff's office and then proceeded with the sheriff and the marshal to the Union hall where they saw Charles Scheer, the president of the Federation. He refused to surrender the property. While the committee was at the courthouse, Superintendent Cook, Foreman Hughes and Supervisor Sarles drove by the courthouse and observed the Union groups. When the committee later proceeded to the Union hall, where a considerable crowd had gathered, Hughes also followed and appeared to be writing. Cook testified that he saw most of the town moving in the direction of the Union hall on the day in question and wanted to see where the crowd was going. He did not see any of the Company officials. Hamblin testified that he did not see Hughes writing. Imes testified that the three supervisory officials rode past in automobiles and that Hughes stopped in front of a hardware store to talk to the owner.

The Union filed an action in the state court to recover Union property from the Federation. The Board found that Foreman Gray instructed Ed Talbot, an employee, to file a disclaimer in the suit. Talbot testified on direct examination that two fellow employees asked him to sign the disclaimer and that Gray was not present. Later, in response to a leading question, he testified that he told the examiner that Gray brought him a disclaimer and said it would be better if he signed it. Seventy-four members signed disclaimers. Of this entire number, only Talbot was found to have done so at the suggestion of Gray. Talbot did not join the Federation.

On November 24, 1939, the Union officials called off the strike. The following day a Union committee advised Chase of this action and handed him a written request for reinstatements of employees. On December 7, 1939, the Union renewed this request by mail, and listed the names, including the 78 employees who were ordered restored by the Board.

In its amended order, the Board withdrew its finding that the Company dominated and supported the Federation in violation of Section 8(2) of the Act, 29 U.S. C.A. § 158(2), but did find that the Company assisted the Federation and thereby interfered with, restrained and coerced its employees in the exercise of their rights guaranteed by Section 7 of the Act, 29 U.S.C.A. § 157. Because this finding must find its support in the incidents narrated above, we have set them out in detail.

Charles Scheer was active in the movement to break the strike. He took an active part in the promotion and formation of the Federation. As found by the Board, he requested William Hughes, a supervisory employee, to print the 200 membership cards which were subsequently used in signing up employees for membership in the Federation. Hughes had these cards printed in Salt Lake City at a time when he was on vacation. Only Scheer knew of the printing of these cards. The Company did not know about it until after it had discharged Hughes. The management had issued positive orders to all its supervisory employees not to have anything to do with the strike and not to interfere with the Union's activities. Merely giving these instructions would not absolve the Company from liability if they were not given in

good faith or if the subsequent conduct of the Company established interference. We fail to see how the printing of these cards by supervisory employees in violation of a positive order from the management and in view of the further fact that not a single employee other than Charles Scheer knew how they were printed, can sustain a conclusion that the employees were intimidated, coerced or interfered with in the exercise of their rights by the manner in which they were printed.

Support for the Board's finding is sought in the printing of the poem, "A Striking Mucker's Last Refrain" on the hectograph of the Company. Chase, the general manager, authorized the printing. The poem had been generally circulated throughout the community before these copies were printed. The hectograph copy was made from a copy which had been in circulation. Only 25 copies of the poem were printed in this way. Six of these went to the wife of the manager, two were sent to the president of the Company in Kansas City, and the remaining copies went to employees out on strike. This satire was circulated largely because of its humorous character. It is quite clear that the poem had its origin with some person other than an officer of the Company, and that it was generally circulated prior to the time these 25 copies were printed. Had the Company intended to influence its employees in the exercise of their rights by the printing of this poem, it would not have stopped with the printing of a mere 25 copies.

Reliance is placed upon the conduct of Manager Chase on the evening of the riot on the night of August 28. Chase testified that he favored the movement to break up the strike; that he had heard an insurrection would be attempted; and that he drove by hopefully, but that everything was quiet and that he saw no sign of encouragement. How could that coerce the employees? There is no showing that the employees even knew his attitude or that he drove by the hall, nor is there any showing that by a single act he encouraged or promoted the insurrection. Complaint is also made of the presence and conduct of Hughes, Edwards and Bleich, three supervisory employees, on this occasion. It seems generally to have been rumored about town that trouble would occur, because a large crowd of citizens were there to see what took place. It is difficult to see how the mere presence of three supervisory employees

in a crowd of curious people could tend to intimidate the employees. They took no part, they did not encourage the mob. Apparently they were there, as was the rest of the crowd, to see what occurred. The "Corky" Scheer incident and the presence of Edwards at the organization meeting of the Federation will be referred to later.

Neither do we feel that the conduct of Cook, Hughes and Sarles at the time the Union committee, accompanied by the sheriff and the marshal, went to the Union hall to demand return of the Union's property, supports the finding of the Board. Again it appears that the community generally was fully informed of this incident and a considerable crowd was present, no doubt to see what occurred. The only improper conduct attributed to Hughes, other than his presence, was that he seemed to be writing. Whether he actually was writing is in dispute, but even if he was, it is difficult to see how that, standing alone, is of sufficient substance to support the finding of the Board.

The three most serious incidents are the "Corky" Scheer incident attributed to Hughes, the presence of Edwards at the Union meeting on the evening of August 28, and the charge that Gray, a supervisory employee, advised Talbot to withdraw from the suit filed by the Union to recover its property from the Federation. The finding that Hughes said, "Boy, I sure picked a good one when I picked Corky Scheer. Look at him go. He is worth his weight in gold," is not supported by clear and convincing proof. June Thomas did testify that she heard Hughes make this remark to Charles Wing. Wing was not an employee of the Company. There is no evidence that any Union member heard the remark. Wing denied that such a remark was made to him. June Thomas also testified that Bleich threw a rock through a window. The Board ultimately found that she was mistaken in this. Only two employees, Leonard Talbot and Thomas Jackson, were in a position to hear the remark if it was made. If Talbot and Jackson heard the remark it did not influence them, because both remained loyal to the Union.

It seems to be conceded that Shift Boss Edwards, an honorary, dues-paying member of the Union, was not privileged to be present or participate in Union meetings. He was present at the meeting at which the members voted to withdraw from the C.I.O. and form the Federation. There is no

claim that he participated in any manner in the meeting. The meeting was open to the public and anyone who wanted to could apparently come in. Others than members of the Union were present. It is difficult to conclude that the mere presence of Edwards under these circumstances could possibly tend to intimidate or influence the members in the exercise of their rights.

Talbot testified on direct examination that two fellow employees asked him to sign a disclaimer in the suit by the Union against the Federation. Later, in response to a leading question, he did state that he had told the examiner that Gray, a company foreman, had brought the disclaimer to him and told him that he had better sign it. The evidence to establish the occurrence of the "Corky" Scheer incident, the presence of Edwards at the Union meeting, and the request for Talbot's signature to the disclaimer is not clear nor very convincing. But for the purpose of this opinion it will be assumed that these incidents did occur as found by the Board. The question then is, are they sufficiently substantial to sustain the ultimate finding of the Board that the Company thereby violated the Act?

■ At most, we have a few isolated incidents or acts which can be construed as violations by minor supervisory employees. These acts, if violations, were committed in the face of a positive mandate from the management for all such employees to refrain from interfering in any way in the activities of the employees guaranteed to them by the Act. It is of course axiomatic that a direct order, no matter how positive, is no protection if it is made to appear that it is a mere sham and subterfuge behind which to conceal unlawful activities. An employer will be liable notwithstanding such an order if it fairly appears that the unlawful conduct of minor supervisory employees has his acquiescence, approval or support. But the inference of liability will not be drawn in such a case from a small number of isolated and unrelated incidents by minor officials, especially when they themselves are susceptible of different constructions. That is especially true when considered in light of a company's fair attitude toward unions. In National Labor Relations Board v. Gallup American Coal Co., 131 F.2d 665, we took into account the company's antagonistic attitude toward unions, both prior to and subsequent to the passage of the Act. See

also National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682. By analogy we must now take into account the unquestioned fair attitude of the Company toward unions and collective bargaining. It had recognized the Union as the bargaining agency of its employees and had entered into a contract with it. It did not refuse to bargain further with the Union. It merely stated that it could not agree to a new contract until the new price for silver was determined. It continued negotiations with the Union until a strike was put into effect.

■ It is our conclusion that these isolated incidents by minor supervisory officials are insufficient to sustain the finding of the Board that the Company assisted the Federation and thereby interfered with, restrained, or coerced its employees in the exercise of their rights guaranteed by Section 7 of the Act.

■ After the Federation was recognized, operations were resumed at the mine and the Company hired new employees to take the place of the members of the Union who remained out until the strike was officially discontinued on November 24, 1939. Thereafter the Union demanded reinstatement of its members who had remained out on strike until November 24. The Board ordered the Company to discharge all new employees hired between August 28 and November 24 and offer reinstatement to 78 of the old employees, members of the Union, on the theory that the Company had contributed to the continuance of the strike by its unlawful aid and assistance to the Federation. We have held that this finding is not supported by substantial evidence. It follows that the Company had the right to replace its striking employees with others in an effort to carry on its business, and was not bound later to discharge them in order to make room for strikers who now sought to return. National Labor Relations Board v. Mackay Radio & Tel. Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381; Wilson & Co. v. National Labor Relations Board, 7 Cir., 120 F.2d 913, 923. The Company did, however, hire a number of new workers after the strike was terminated and application had been made by the old employees for reinstatement. This constituted an unfair labor practice. That portion of the Board's order requiring the reinstatement of these employees will be enforced. In all other respects, enforcement will be de-

nied. There is no satisfactory evidence nor finding as to the number of new employees who were hired after the termination of the strike. It seems to be conceded that there were approximately 20 such. Final decision will be deferred and the case is hereby remanded to the Board to make findings as to the names and number of new employees hired after the termination of the strike, and the names of the 78 ordered reinstated by the Board who are eligible to re-employment in their places, and the order in which they are entitled to reinstatement, and certify such findings to this court. When this is done, the final order of the court will be entered in conformity with the views expressed herein. It is so ordered.