**KANSAS MILLING CO. v. NATIONAL LABOR RELATIONS BOARD.**

No. 4036.

United States Court of Appeals
Tenth Circuit.

Nov. 9, 1950.

Rehearing Denied Dec. 11, 1950.

George Siefkin, Wichita, Kan. (Carl T. Smith, Wichita, Kan., on the brief), for petitioner.

Bernard Dunau, Washington, D. C. (David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, Washington D. C., and Leonard S. Kimmell, Cincinnati, Ohio, on the brief), for respondent.

Before BRATTON, HUXMAN and PICKETT, Circuit Judges.

HUXMAN, Circuit Judge.

This case is here on the petition of the Kansas Milling Company to review and set aside an order of the National Labor Relations Board of October 28, 1949, issued pursuant to Section 10(c) of the National Labor Relations Act, 29 U.S.C.A. § 160(c). In its answer the Board asks enforcement of its order.[1]  Petitioner's first contention is

---

1. The order, so far as material, required the company to cease and desist from:

"(a) Discouraging membership in American Federation of Grain Proces-

that the action was barred because the unfair labor practices relied upon in the Board's order occurred more than six months prior to the filing of the second amended charge on which the complaint issued.[2]

The Act requires a charge to be filed before the Board may issue a complaint. The charge, however, is not a pleading. It merely sets in motion the machinery of an inquiry to determine whether a complaint shall issue. It has served its purpose when the Board embarks upon an inquiry.[3] Anyone can file a charge. Many are filed by private citizens unskilled in the law or art of pleading. To require the strictness of formal pleadings in such cases would seriously impair the salutary purpose of the Act and the operations of the Board charged with its administration. A charge in the general language of the statute is sufficient if it challenges the attention of the Board and leads to an inquiry under the provisions of the Act.

So likewise an amended charge will be timely although filed more than six months after the occurrence of the alleged unfair labor practice if it relates to an unfair labor practice inherent in or connected with the original charge. In such cases, it will relate back to the filing of the original charge. The doctrine of relation back in pleading is well recognized in the general law.[4] It should not be narrowly applied in a remedial act such as the one before us when the only purpose of the charge is to set in motion an inquiry by the Board to determine whether a violation has occurred.

sors, A. F. of L., Local Union 20991, or in any other labor organization, by refusing to reinstate any of its employees, or by in any other manner discriminating in regard to their hire or tenure of employment or any term or condition of their employment;

"(b) In any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form labor organizations, to join or assist American Federation of Grain Processors, A. F. of L., Local Union 20991, or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, and to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment, as authorized in Section 8 (a) (3) of the Act."

The pertinent parts of the order also required the company to take the following affirmative action:

"(a) Offer to each of the employees named in paragraph '2' of Appendix A, attached hereto, immediate and full reinstatement to his former or a substantially equivalent position, without prejudice to his seniority or other rights and privileges in the manner set forth in the section entitled 'The remedy' hereinabove;

"(b) Make whole each of the employees named in paragraphs '2' and '3' of Appendix A for any loss of pay he may have suffered by reason of the discrimination against him, by payment to him of a sum of money equal to the amount that he normally would have earned as wages from October 18, 1947, to the date of his reinstatement, in the manner set forth above;

"(c) Upon application, offer reinstatement to or place upon a preferential hiring list, and make whole, the employees named in paragraph '4' of Appendix A in the manner set forth above;"

(d) (To post appropriate notice).

(e) (Notify the regional director of compliance with the order).

2. Section 10(b) of the Labor Management Relations Act, 61 Stat. 136, 146, 29 U.S. C.A. § 160, so far as material, provides that no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom said charge is made unless the person aggrieved thereby was prevented from filing the charge by reason of service in the Armed Forces, etc.

3. N.L.R.B. v. Fulton Bag & Cotton Mills, 10 Cir., 180 F.2d 68, 71; N.L.R.B. v. Indiana & Michigan Electric Co., 318 U. S. 9, 63 S.Ct. 394, 87 L.Ed. 579.

4. New York Cent. & Hudson R. R. Co. v. Kinney, 260 U.S. 340, 346, 43 S.Ct. 122, 67 L.Ed. 294; Rule 15(c), Fed.Rules Civil Procedure, 28 U.S.C.A.; Isaacks v. Jeffers, 10 Cir., 144 F.2d 26; Michelsen v. Penny, 2 Cir., 135 F.2d 409.

Viewed in this light, we are of the opinion that the company's contention that the second amended charge alleged unfair labor practices not alleged in the original or in the first amended charge is not well founded.

The first charge was filed September 23, 1947. It alleged in the general language of the statute that the company had interfered with, restrained and coerced its employees, discriminated in regard to. hire and tenure and had refused to bargain in good faith in violation of their rights under Section 7 of the Act, 29 U.S.C.A. § 157. The first amended charge was filed November 7, 1947. It charged that the company had "since June 14, 1947, refused to bargain in good faith * * * and refused to reinstate upon application of the employees named in Appendix A." The second amended charge upon which the complaint was issued was filed on April 8, 1948. It charged that since about August 11, 1947, the company had threatened its employees with loss of seniority and their jobs if they engaged in a strike; told them during the course of the strike that unless they returned to work they would lose their seniority and their jobs; and told them to repudiate the Union and that unless they did so they would be discharged. That on or about August 23, 1947, the company through its officers and representatives discharged the employees listed in Appendix "A" because of having engaged in a strike against the company, because of membership in the Union, and because of engaging in other concerted activities for the purpose of collective bargaining, etc.

■ The first charge is general in its terms. It merely alleged violations of the employees' rights under Section 7 by the company in restraining and coercing the employees and in discriminating against them in regard to hire and tenure and in refusing to bargain in good faith. The first amended charge alleged refusal to bargain and refusal to reinstate employees because of Union activities. The second amended charge merely alleged in particular acts constituting unfair labor practices under Section 7 of the Act. There is nothing inconsistent in the first or second amended charge with the general allegations of the original charge. They are somewhat in the nature of a bill of particulars making more definite the general allegations of the original charge and thus relate back to the original charge.

The facts are involved. The record is long, and as usual in such cases, there is conflict in the evidence. The following facts are, however, without dispute.

The American Federation of Grain Processors, A. F. of L., herein called the Union, has been since November 2, 1939, the certified bargaining representative of the company's production and maintenance employees. It had executed yearly collective bargaining agreements with the company from 1939 until 1947. On June 9, 1947, pursuant to a renewal clause in the existing collective bargaining agreement, which was to expire July 7, 1947, negotiations were begun between the company and the Union. Disagreements arose between the parties and by early August an impasse had been reached in the contract negotiations on the issues of (1) a maintenance of membership clause, (2) holiday pay, and (3) the inclusion of second millers, a class of minor supervisors, in the appropriate unit. On August 8, the employees voted to strike. The following day Labor Director Palmer was notified that the employees would strike on August 11. The employees struck on schedule. At the time of the strike the company had about 175 to 200 production and maintenance employees, of whom 148 were Union members. The strike did not result in a complete shut down of the Mill. The company continued to operate the plant with about 30 employees, ten of whom were Union members.

On the day of the strike the company mailed a copy of a letter to its employees outlining its position.[5]

5. The letter of August 11, was as follows:
 "To Whom it May Concern:
 "The Union called a strike on us this morning at eight o'clock. According to the story given the local newspapers by the Union, this was called because of our not agreeing with the Union on our second millers being in the union; second, because of our failure to agree to maintenance of membership; third, failure of

On August 15, the company notified all of the strikers by letter that it intended to re-man and operate its plant with new employees; that it thought a fair warning period for the return of the old employees would be August 23, and that it hoped they would return to their jobs and that if they did not return the company had no other alternative than to hire new employees to take the jobs "which you have vacated." [6]

us to agree with the Union that paid holidays would be used in computing overtime.

"At the time of forming the union, the Union claimed second millers which the company opposed because second millers are supervisors and operate the mill about sixteen hours every day without any other supervision. The second millers being in the Union has been a source of trouble ever since because of their divided loyalty between the Union and the Company as from a practical operation it developed that their loyalty to the Union came first. The new millers that the Union claimed were qualified last December are not even yet qualified, but the Company is still trying to make millers out of them.

"The Company was not in favor of maintenance membership but went along on this after a directive order during war days and continued this even after that period until the Union took advantage of our employees and because some of them told the truth in meetings between the Company and the Union, the Union fined them and removed them from certain union committees on which they were serving. The company feels that their employees, whether or not members of the union, are entitled to fair treatment and fair play.

"As regards paid holidays, the company does not feel that they should pay for time not worked; but, to try to avoid a strike the Company was willing to compromise and agree to paid holidays but with the understanding that those paid holidays would not be figured in in computing overtime. Since this compromise did not serve the purpose and the strike has been called anyway, this is one condition previously agreed to by the Company that does not stand.

"The Union's statement to the local newspapers did not mention a number of other points not agreed on, including Union Shop, Adjustment for Maltsters and Malt Men, Engineers, Traffic Manager, Sewing Machine Men in the feed mill plus the Union insisting that their committee be consulted before the Company could discharge a man for cause and that their committee be allowed to pass on the qualifications of a man for a job.

"The last two items are strictly management responsibility and the Company does not and cannot recognize that the Union has any right to insist on those last two points.

"As regards Union Shop, we have no objections to any of our employees belonging to the Union if they desire, but we do not want to take any step which would force any employee at any time to join the Union against his will. The above does not apply to foremen and those in a supervisory capacity whose efficiency would be destroyed by such membership.

"For those employees now working, all conditions and wages that the Company agreed to, have been put into effect as of July 7, 1947 except paid holidays, and the same will be done for you if you will report for work not later than Monday morning, August 18, 1947.

"Now the Company has tried its utmost to be more than fair and we think the vast majority of our employees want to be fair so don't you think in all fairness to yourself and the Company that you can see your way clear to come back to work if you haven't already done so? We are anxious to have you back and we hope you will see it that way, as we are sure that it will be to our mutual benefit.

"With kindest personal regards, I am
"Sincerely
"Ward Magill, President."

6. The letter of August 15, was as follows:
"To Whom It May Concern:
"The executives of The Kansas Milling Company have an obligation to the owners—the stockholders—to operate our mills.

"Up to now, we have made no move to re-man our plants by hiring new employees as we have hoped that our old employees would return to their jobs. We think you will agree with us that we should not be compelled to wait indefinitely. After serious consideration of all elements of the problem, we have decided that a more than fair waiting period would be Saturday, August 23rd.

"We sincerely hope that you will return to your jobs within the time fixed

On August 19, a meeting was held between representatives of the company and the Union. At that time, according to the Union witnesses, representatives of the company stated: "The company is hiring new employees and they have promised them permanent jobs and they intend to keep their promise, and the company's position is that those people that are on strike definitely do not have seniority. If they come back, they will come back as new employees."

On September 6, the company wrote each of the strikers notifying them that they were no longer covered by the group insurance policy and advised them that they had until September 25, 1947, to convert to a standard policy.[7]

On September 12, the company wrote the employees, as follows: "Since you have terminated your employment with this company, if you have any clothes or other personal belongings at the plant, we would like for you to call for them by September 16, 1947 * * *."

On September 16, 1947, another meeting was held between the representatives of the Union and the Company. The subjects discussed at this meeting are in controversy and will be hereinafter discussed. At the September 16 meeting, the company made an offer of settlement which was reduced to writing, submitted to the Union members and was rejected. The proposed settlement provided for the exclusion of second millers from the bargaining unit; voluntary maintenance of membership; no offer with respect to holidays not worked; that the company should have the exclusive right to pick the employees that were to return and that

their seniority was to be restored without regard to Union affiliation.

On October 7, another meeting was held between the Company and the Union. The proposed contract of September 16 was reworded and was submitted to the Union members and was accepted. A new contract was thereupon executed and the proposed settlement was incorporated in the contract as Section 12 thereof. It provided, so far as material, that the Union would submit to the company within two days after the signing of the contract a list of names of the employees of the Union who wished to immediately resume their employment. That the company would, as soon as possible thereafter and not more than three days thereafter, furnish the Union a list of those Union members (1) whom it would immediately put back to work, and (2) whom it would put back to work as soon as possible, and not to exceed a period of thirty days.

The company agreed to give every consideration to those seeking employment in their former jobs or jobs closely related thereto, with the employees taken back having a preferential right to their old jobs in cases of vacancy, to restore full seniority rights to those reemployed, retroactive to July 7, 1947.

The strike terminated on October 17. Following the end of the strike, the Union submitted 120 names of former employees as those desiring reinstatement. The company offered immediate reemployment to eleven and agreed to take back twenty-one others when openings arose. All strikers were individually considered for reemployment by the supervisory employees under in-

---

as we would far prefer to work with our old employees and have them receive the benefits now provided for. If you do not return, the company has no other alternative than to hire new employees to take the jobs which you have vacated. We trust this will not be necessary.

"With kindest regards, I am

"Sincerely
"Ward Magill, President."

7. On September 6, the Company wrote as follows:
"Mr. Frank Smith, 1458 N. Topeka, Wichita, Kansas.

"Dear Mr. Smith: Under the terms of the Group Insurance Policy in which you were participating, you are no longer covered.

"We have been advised by the Equitable, that you have until September 25, 1947, in which to convert your Group Life Insurance to any standard form policy now being issued by The Equitable, at your attained age.

"The Equitable office in Wichita, is in the First National Bank Bldg.

"Yours truly,
"The Kansas Milling Co.
"By May Lewis, Acct."

structions given them by the General Manager to rehire all the men that they felt would make good employees or put them on the call list.

Following the meeting of October 21, the company sent the Union a letter listing eleven strikers who would be given preference in filling future openings with the company. On May 5, 1948, the date of the hearing before the trial examiner, the company had reinstated thirty-four strikers.

It is conceded that at its inception, the strike was an economic one. The Board, however, concluded that it was converted into an unfair labor practice strike by the acts of the company, and became such at least by August 23. The Board held that the company after August 23 advised the Union that the strikers who had not obeyed its warnings and returned to work were no longer employees and that any of them who wished to be reemployed would be considered only as new job applicants if there were any vacancies and that this constituted an unfair labor practice. The Board also found that this became the paramount issue in the negotiation to settle the strike in its latter stages and that the effect of this unlawful conduct prolonged the strike and converted the economic strike into an unfair labor practice strike.

█ We cannot agree that the only issue remaining after August 23, was the status of the striking employees with respect to seniority rights. Lee R. Meador, a witness called by the Board, testified that he was the attorney for the Union throughout these negotiations. Asked as to the questions involved in the August 26 meeting, he said: "Well, the entire negotiations were stalled over the question of second millers. There was hardly any question of what the position of the company was at that time. They were insisting that they were hiring new employees to fill the vacancies occasioned by the strike * * *."

He was asked whether it was not the position of the company that any striker who wanted to come back would come back on the same basis as new employees. He did not give a positive answer to this question. He did testify concerning the subsequent meeting of September 16. When asked what happened at the meeting, he said: "It was the same problem, the problem of the second millers and how the company was filling the jobs in the plant with people who wanted to go to work in spite of the strike, and that, if any of the former employees or men on strike wanted to come back to work, they would have to make an application and submit themselves to the mercy of the company."

It is thus clear that the status of the second millers remained a bone of contention throughout the entire controversy and was not eliminated until the execution of the settlement contract.

There are isolated statements in the record, which, if considered alone, would tend to show an antagonistic attitude on the part of the company toward the Union and would support a finding that the company resorted to threats and coercion against its employees. But all such statements must be taken in context and the entire record must be considered in determining whether the company was guilty of unfair labor practices and whether there is substantial evidence to support such a finding. That the Board did not attach much significance to these isolated incidents and statements is evidenced by the fact that it found the economic strike had been converted into an unfair labor practice strike by August 23.

Whether the Board's finding of unfair labor practices finds support in the record must be determined from a consideration of the company's letters of August 11, August 15, September 6, and September 12. We see nothing coercive or threatening in the letter of August 11 set out in footnote 5. Summarizing this letter it was the intent of the company to lay its case before the employees and no doubt before the public, and persuade them to return to work. The letter was mild, factual and free from intimidation or threats.

The letter of August 15 advised the employees that the company intended to hire permanent replacements for the strikers after August 23, and that if thereafter the strikers sought to return they might be out of a job. This being an economic strike, the company had a right to replace the strik-

ers with other permanent employees, and could, thereafter, refuse to discharge them to make room for the returning strikers.[8] The Company was not obliged to advise the strikers what it proposed to do. It could have quietly gone about hiring these replacements and then simply refused to reinstate strikers if they thereafter sought to return. How then can it be said that a warning of what the company had a right to do, without notice, constituted an unfair labor practice. The concluding sentence that, "If you do not return, the company has no alternative than to hire new employees to take your jobs *which you have vacated*," when taken in context does not support a finding that the company thereby threatened the employees with discharge if they did not return to work by August 23. "Vacate" is sometimes used in the sense of leaving or going away.[9] A fair interpretation of this letter is that it advised the employees that the jobs which they had left would be filled after August 23.

Neither is the letter of September 6 a violation of the Act. True, it proceeds on the assumption that the strikers were no longer employees and therefore not covered by the group insurance policy. If their jobs, in fact, had been filled by permanent employees, they were no longer employees and would not be covered by the group policy. It would seem that the company should not be found guilty of an unfair labor practice because it was concerned with the insurance status of these employees and sought to call this matter to their attention.

Neither does the letter of September 12, 1947, constitute a violation of the Act. True, it assumes that the strikers are no longer employees. The company may or may not have been correct in this assumption. If all of the jobs had in fact been filled by permanent replacements by that time, the strikers would have terminated their employment with the company and would not be employees. On the other hand, if their jobs had been filled by temporary employees, the employee status would continue.[10] But even if the company erred in its assumption in its letter of September 12, 1947, that the strikers had ceased to be employees, that assumption did not prolong the strike because, as pointed out, the Union was contending at all times up to the execution of the contract on October 16 that the second millers were entitled to membership in the bargaining unit. Until that demand was withdrawn, the company was not guilty of prolonging the strike. The demand with regard to the second millers was not withdrawn until October 16. Thereafter, the old employees were entitled to reinstatement to any jobs which had not been permanently filled prior thereto. The only request for reinstatement thereafter was the list of 120 names furnished to the company on October 18, 1947.

The Board has made no finding as to the number of permanent replacements which had been made by that date, nor as to the number of jobs held by temporary employees. In the absence of such a finding no order with respect to reinstatement of striking employees can be made.

One further point needs consideration. The company refused to reinstate six employees (Harris, Twyman, Cain, Flake, Stockwell, and Coplin) because of alleged unlawful and criminal acts during the strike. The Board found against the company in this respect and held as a fact that the conduct of these employees was not of such a character as to render them unsuitable for reemployment. Without setting out the evidence in detail we conclude that the Board's finding in this respect is supported by the record. These six employees are entitled to the same consideration which is to be accorded to the remaining 120 named in the list furnished to the company.

Since the record does not help us to determine the number of positions, if any,

8. N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381.

9. See Webster's New International Dictionary; Webster's Collegiate Dictionary, 5th Edition; Funk & Wagnalls College Standard Dictionary.

10. See N. L. R. B. v. Mackay Radio & Telegraph Co., supra.

that had not been permanently filled on October 18, 1947, we are unable to enter a final order. The final decision is therefore reserved and the matter is remanded to the Board to take further evidence to establish how many places, if any, not filled by permanent employees were available as of October 18, 1947, and certify such findings to this court. When this is done, a final order will be entered in conformity with the views herein expressed.[11]

BRATTON, Circuit Judge (concurring in part and dissenting in part).

I concur in that part of the opinion of Judge Huxman holding that none of the alleged unfair labor practices was barred by section 10(b) of the Labor Management Relations Act, 61 Stat. 136, 146, 29 U.S.C.A. § 160, and in that part holding that the six named employees were not of such character as to render them unsuitable for re-employment. But I dissent from that part holding in effect that certain findings of unfair labor practices are not sustained by evidence.

Without detailing the evidence at length, it is my view that the material findings made by the Board in respect to the commission of unfair labor practices are sustained by evidence and inferences fairly to be drawn from it. And, reminding ourselves anew that Congress committed to the Board the function of weighing evidence, drawing inferences from established facts, and resolving conflicts in evidence, and that findings made by the Board are binding on review if sustained by substantial evidence, National Labor Relations Board v. Crompton-Highland Mills, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320, I would enter a conventional order of enforcement.

PICKETT, Circuit Judge (concurring in part and dissenting in part).

I concur in the opinion of Judge Huxman except that portion which holds that the statute of limitations is not applicable in this case, from which portion I dissent.

Section 10(b) of the National Labor Relations Act provides: "No complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made". The first charge was filed on September 23, 1947, by five employees of the company. It charged the company with unfair labor practices in violation of Section 8(a), Subsections (1, 3 and 5), since June 14, 1947, as follows:

"1. Has interfered with, restrained or coerced employees in the exercise of the rights guaranteed in Section 7.

"2. Has discriminated in regard to hire or tenure of employment or tenure or condition of employment.

"3. Has refused to bargain in good faith with the bargaining representative of all production and maintenance employees, including second millers of the company, excluding executives, supervisory employees, office workers and chemists."

On November 7, 1947, the union filed what it designated as an amended charge. It made no reference whatever to the charge filed by the five employees on September 23rd. This so-called amended charge alleged a violation of Section 8(a) (1 and 3) in the following terms: "The company * * * has, since June 14, 1947, refused to bargain in good faith * * * and refused to reinstate upon application (59 named) employees because of their activities in behalf of the undersigned labor organization."

On April 8, 1948, the union filed another charge designating it as an amended charge. It made no reference to either of the previous charges and was complete in itself. It charged a violation of Section 8(a) (1, 3 and 5) of the Act, in that the company: "has, since on or about August 11, 1947, threatened employees with the loss of their seniority and their jobs if they engaged in a strike; told employees, during the course of the strike which commenced on or about August 11, 1947, that unless they returned to work they would lose their seniority and

11. N. L. R. B. v. Shenandoah-Dives Mining Co., 10 Cir., 145 F.2d 542.

their jobs; told employees to repudiate the Union, and that unless they did so they would be discharged; that on or about August 23, 1947, the Company, through its officers and representatives, discharged (152 named) employees because of having engaged in a strike against the Company, because of their membership in the Union, and because of engaging in other concerted activities for the purpose of collective bargaining and other mutual aid and protection, and thereafter refused to reinstate them for the same reasons as above."

The complaint filed by the General Counsel was based upon this charge. It seems clear to me that this latter charge fixed the unfair labor practices of the company as of August 23rd and prior thereto, and unless the latter charges relate back as of the time of the filing of one of the previous charges, the limitation provided for in the Act is applicable. The board held that the April 8th charge contained matters arising out of the conduct set forth in the original charge and the first amended charge, and therefore relates back to the date of these charges. If we consider the filing on November 7th as an amended charge, then the filing on September 23rd is superseded and we have only the November 7th charges. Proctor and Gamble Defense Corp. v. Bean, 5 Cir., 146 F.2d 598, 601. Any subsequent amendment must be germane to this charge. Encyclopedia of Federal Procedure, 2nd, Vol. 5 Sec. 1893. When an amendment introduces different and additional claim or charge not included in the pleading or charge amended, it does not relate back to the original filing and if in the meantime the statute of limitations has run against the new claim or charge, the same is barred. L. E. Whitham Const. Co. v. Remer, 10 Cir., 105 F.2d 371, 375. The November 7th charge obviously grew out of the failure of the company to reinstate employees in accordance with the contract of October 18th negotiated between the union and the company. The April 8th charge was entirely different. It referred back to the activities of the company on August 23rd and prior thereto and the evidence relied upon to support the allegations were statements made by officials of the company and letters written by it wherein the employees were advised that if they did not return to work by August 23rd they would no longer be considered employees of the company. Proof of the November 7th charge would not sustain this charge. I do not think that the claims in this latter charge were at all germane to those of the November 7th filing. It is a complete and separate charge regardless of its designation, and therefore not within the terms of Rule 15(c), Federal Rules of Civil Procedure. This brings the case within the reasoning of Judge Parker in Joanna Cotton Mills Co. v. N. L. R. B., 4 Cir., 176 F.2d 749, 754, with which I agree and think applicable to this case.

I agree that a charge is not a pleading in the strict sense of the word and a liberal interpretation should be given it. It does, however, have a purpose. It sets in motion the investigative machinery of the board but the investigation is limited to the specific charge. Its service upon the employer informs him of unfair labor practices of which he is accused. It stays the statute of limitations of all the charges which it contains and no more. The violation occurring more than six months before a charge has been filed may not be made the basis of a complaint by including it in an amendment to a charge already on file to which it is not germane. To hold otherwise nullifies the limitation statute if any kind of a charge has been filed.

I would reverse the order of the board and dismiss the complaint.