## NATIONAL LABOR RELATIONS BOARD v. CITIES SERVICE OIL CO.

### No. 348.

Circuit Court of Appeals, Second Circuit.

July 2, 1942.

Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, Hilda D. Shea, Harry G. Carlson and Daniel Baker and N. Barr Miller, all of Washington, D. C., for petitioner.

Hatch & Wolfe, of New York City (Carver W. Wolfe and Eli Ellis, both of New York City, of counsel), for respondent.

William L. Standard, of New York City (Edward J. Malament, of New York City, of counsel), for intervenor.

Before CHASE, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

This case comes to us upon a petition for enforcement of an order of the National Labor Relations Board, directing the respondent to cease and desist from unfair labor practices, to disestablish two labor organizations, to offer reinstatement and back pay to five discharged employees, and to post appropriate notices. The facts are set out in detail in the Board's decision, 32 N.L.R.B. No. 165, and need not be repeated here.

■■ Briefly, the Board found that one Powers, respondent's "shipping master," interfered with and coerced respondent's unlicensed personnel in the exercise of the rights guaranteed them by § 7 of the National Labor Relations Act, 29 U.S.C.A. § 157, by questioning applicants for jobs about their union affiliations, vilifying the National Maritime Union, and announcing that he would not hire any members of that union. Similar interference was laid to several officers of respondent's vessels. These findings were supported by substantial evidence and, therefore, cannot be attacked in this court.

■ Respondent's chief defense is that Powers' conduct is not ascribable to the company, because he was not a "supervisory" employee and had no power to hire or fire. Powers, as shipping master, was required to interview applicants for jobs. Although he was not an employment manager, it was established that, on some occasions, he rejected applicants as not qualified, and it is not contended that such decisions were reviewed by his superior, Captain Deshler. Following an interview with Powers, applicants customarily were interviewed by Captain Deshler, who had the sole authority to hire and fire. The Board found, however, on substantial evidence, that some men were employed without being interviewed by anyone other than Powers. The Supreme Court has held that the employer may be charged with the conduct of an official who has no power to hire and fire, International Ass'n

of Machinists v. N. L. R. B., 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50. But respondent insists that Powers was not a "supervisory" official. While it is true that that term has often been used in these cases, we think respondent has misunderstood the test established by the International Ass'n of Machinists case. The court there said: "The employer, however, may be held to have assisted the formation of a union even though the acts of the so-called agents were not expressly authorized or might not be attributable to him on strict application of the rules of respondeat superior. We are dealing here not with private rights (Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738) nor with technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants, but with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination or influence. The existence of that interference must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees' choice and for which the employer may fairly be said to be responsible. Thus where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates. Here there was ample evidence to support that inference. As we have said, Fouts, Shock, Dininger and Bolander all had men working under them. To be sure, they were not high in the factory hierarchy and apparently did not have the power to hire or to fire. But they did exercise general authority over the employees and were in a strategic position to translate to their subordinates the policies and desires of the management. It is clear that they did exactly that. Moreover, three of them—Fouts, Shock and Bolander—had been actively engaged during the preceding weeks in promoting the company union. During the membership drive for petitioner they stressed the fact that the employer would prefer those who joined petitioner to those who joined U. A. W. They spread the idea that the purpose in establishing petitioner was 'to beat the C. I. O.' and that the employees might withdraw from the petitioner once this objective was reached.

And in doing these things they were emulating the example set by the management. The conclusion then is justified that this is not a case where solicitors for one union merely engaged in a zealous membership drive which just happened to coincide with the management's desires. Hence the fact that they were bona fide members of petitioner did not require the Board to disregard the other circumstances we have noted." Applying that test, we have no difficulty in deciding that the employees of respondent would have "just cause to believe" that Powers was acting on behalf of the company. Indeed, it seems difficult to understand how such a "cause to believe" could ever be absent where the acts of interference are committed by a person of any importance in a personnel office; employees would naturally assume that, if the company's views were known anywhere, they would be known to such personnel officials, and that the statements of a personnel official, daily engaged in interviewing applicants, would not be merely innocent flights of self-expression. Furthermore, if the class of officials whose conduct is binding on the employer were to be limited to those high in the organizational hierarchy, an invitation would be extended to violate the Act with impunity through the medium of employees with ostensibly unimportant duties.

In finding that the Unlicensed Employees' Collective Bargaining Agency of Cities Service Oil Company was a company-dominated union, the Board is supported by substantial evidence. Powers was the moving spirit behind its organization, and made use of his office to solicit membership for it. Its successor, the American Tankerman's Association, succeeded to its illegality. It credited members of the Agency with the initiation fee paid by them to the Agency; there was evidence that one of its purposes was to give the employees who had joined the Agency something in return for their initiation fees. In fact, one man, on complaining to Powers about the fee paid to the Agency, was told by him, before the Association had come into existence, that such an organization would be set up and that he would then be given credit for his payment.

The respondent's defense (in addition to the assertion of Powers' lack of authority which we have just rejected) is that a letter was sent by it to the members of its crews, stating that it was entirely

neutral as to union membership and that "anyone who represents our stand as contrary to this is doing it without our authority." There is no proof that this letter was received by the crews; indeed, it is not even part of the record. If it was intended as a repudiation of Powers' conduct, we cannot say that the Board erred in finding that it was ineffective, since Powers continued his activities in organizing the Agency for some weeks after the date of the letter. In any event, the test of respondent's responsibility for the activities of its subordinates is, as held by the International Ass'n of Machinists case, whether the employees had "just cause to believe" that the company approves of those activities, and we cannot say that, as a matter of "law," this letter was an effective disavowal. That is an issue of fact for the Board. Upon the record, there was substantial evidence to sustain the Board's finding that both the Agency and the Association were organized and maintained in violation of § 8(2) of the Act, 29 U.S.C.A. § 158(2). See Sperry Gyroscope Co. v. N. L. R. B., 2 Cir., 129 F.2d 922.

The Board also found that five employees had been discharged because of their support of the N. M. U. and their refusal to join the two company-dominated unions just mentioned. As to each, there was substantial evidence in support of this finding, although there was, as ordinarily is true, some evidence that the employee had broken company regulations, had had an altercation with a superior, or had performed some duty inadequately. The evaluation of such conflicting evidence is for the Board, and we cannot say it erred in finding that the reasons assigned by respondent for the discharges were only pretexts. It has, of course, often been pointed out that unusually severe punishment for a common offense, or a sudden discovery of employees' inefficiency when they "cast their lot with the Union," taken against a background which the Board is best fitted to understand, may be grounds for a finding that § 8(1) and (3) of the Act, 29 U.S.C.A. § 158(1) and (3) have been violated. N. L. R. B. v. Air Associates, 2 Cir., 121 F.2d 586, 591; New York Handkerchief Mfg. Co. v. N. L. R. B., 7 Cir., 114 F.2d 144, 147.

The respondent argues that prejudicial error was committed by the trial examiner in excluding the testimony of Captain Deshler as to certain investigations of the cause of the five discharges. Since he was permitted to answer the questions of respondent's counsel as to three of these discharges, we can readily pass upon the merits of this objection. It appeared that Deshler made no personal investigation but rather talked with other persons, some of whom he could not name, and accepted their reports. The trial examiner was at first disposed to admit the testimony, but later, after strenuous objection by the Board's attorney, excluded further testimony and struck the answers already given. Respondent's counsel admits that the evidence is hearsay, and, while the Board is entirely free to accept such evidence, we cannot say that it commits reversible error in excluding it. As the Board's able counsel admitted at the oral argument, it probably should have been admitted, but we agree with him that its exclusion was not fatal. From the answers that were admitted but later stricken, we can see that the testimony would probably have added little to the explanations given in the letters between the Board's Regional Director and respondent's counsel, already in the record as exhibits. The Board rejected these explanations as unsupported and as contrary to the evidence adduced before the trial examiner. It seems apparent that a repetition of these explanations by Deshler, based on what others told him, would not have provided the credible support that the Board found wanting. In this connection, it is significant that respondent's counsel, at the time of the hearing before the trial examiner, apparently regarded Deshler's testimony as far less significant than he now asserts it was. When the trial examiner made his ruling, respondent's counsel said: "Well, I debated a long time as to whether I would put him on or not, or whether I would put in any evidence. I thought I would produce him here and ask the questions and if your Honor ruled that he cannot answer, well and good." It should be noted that the respondent made no effort to put on the stand as witnesses any of the persons who made the investigations and who were, therefore, in the best position to testify as to what they had found. While Deshler was denied the right to give their conclusions, it does not appear that they would not have been permitted to do so; in fact, the trial examiner went further and apparently ruled that he would allow Deshler to answer if "we

have at least the names of the persons that were talked to, the conversations that took place, and the time when it took place." In the circumstances, his ruling was not reversible error.

 Since the Board at the oral argument here raised the question, we take this occasion to rectify an erroneous impression of something we said in N. L. R. B. v. Air Associates, 2 Cir., 121 F.2d 586, 592.[1] There the employer had discharged two employees, Rodolitz and Geoghegan, telling them that it was obliged to do so in order to make room for two union officials who had been previously discharged. The employer asserted that, when it discharged Rodolitz and Geoghegan, it did not know they were union members. The Board held that the existence of such knowledge was irrelevant. It said that, assuming that the employer thought them non-union members, nevertheless their discharge violated the Act, the prohibition of which "extends to any discharge which is intended, or has as its purpose and effect, to discourage membership in a labor organization; a discharge for that purpose having been found, knowledge by the respondent of the union membership of the employee for that reason discharged becomes immaterial."[2] We were unable, on those facts, to discover any rational basis for a conclusion that the discharge violated the Act; for an employer to tell men whom, so far as the record showed, he thought to be non-union men that they must be dismissed to make room for union men, would not necessarily tend to discourage union membership. If the Board had found on substantial evidence that such was the result, we would have accepted its finding. But we were, instead, left unaided by the Board's expert knowledge of the subject. In that setting, we said: "But we can discover no satisfactory explanation by the Board which would permit either a finding that the unlawful purpose had the effect required by the act, or findings from which such an effect might reasonably be inferred." That statement should be read in its factual context and, accordingly, should be very narrowly limited.[3] It has often wisely been said that every judicial opinion is to be read with regard to the facts of the case as understood by the court, and the question actually decided.

The petition for enforcement is granted.

---

[1] See, e.g., comment in Mason, Briefing Practice of the N. L. R. B., 10 George Wash. L. Rev. (1942) 560, 573.

[2] Matter of Air Associates, Inc., 1940, 20 N. L. R. B. 357, 375.

[3] We have already so construed it. See Perkins v. Endicott Johnson Corporation, 2 Cir., May 6, 1942, 128 F.2d 208.