NATIONAL LABOR RELATIONS BOARD
v. GAYNOR NEWS CO., Inc.

No. 231, Docket 22297.

United States Court of Appeals
Second Circuit.

Argued May 13, 1952.

Decided June 24, 1952.

Chase, Circuit Judge, dissented in part.

George J. Bott, David P. Findling, A. Norman Somers, Frederick U. Reel, all of Washington, D. C., and Louis Schwartz, Paterson, N. J., for petitioner.

Bandler, Haas & Kass and Julius Kass, all of New York City, for respondent.

Vladeck & Elias, New York City (Stephen C. Vladeck and Milton Horowitz, New York City, of counsel), for Newspaper & Mail Deliverers' Union of New York.

Before AUGUSTUS N. HAND, CHASE and FRANK, Circuit Judges.

FRANK, Circuit Judge.

The Board has found the employer-respondent guilty of violating Sections 8(a) (1) (2) and (3), National Labor Relations Act, 29 U.S.C.A. § 158(a) (1–3), by (1) retroactively paying wage increases and vacation benefits to union members only, and (2) agreeing to and enforcing an illegal union shop contract in 1948 without first obtaining Board certification that a majority of employees had authorized such an agreement in a union shop election. The employer admits substantially all the facts of both violations, but, on several grounds, defends its actions and repudiates the consequences.

■ 1. It says, first of all, that § 10(b) of the Act, 29 U.S.C.A. § 160(b) prohibits prosecution for refusing the retroactive benefits to anyone but Loner, the employer who first filed charges. This original charge was later amended—more than six months after the violations charged—to in-

clude (a) a charge of the same discriminatory treatment of other non-union employees besides Loner, and (b) a charge that the 1948 contract was illegal and in violation of employees' rights under § 8(a) (1) (2) (3) of the Act. Section 10(b) of the Act reads:

"No complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made".

This section has been uniformly interpreted to authorize inclusion within the complaint of amended charges—filed after the six months' limitation period—which "relate back" or "define more precisely" the charges enumerated within the original and timely charge. The "relating back" doctrine for this purpose has been liberally construed to give the Board wide leeway for prosecuting offenses unearthed by its investigatory machinery, set in motion by the original charge. N. L. R. B. v. Kobritz, 1 Cir., 193 F.2d 8, 14–16; Cusano v. N. L. R. B., 3 Cir., 190 F.2d 898, 903–904; N. L. R. B. v. Kingston Coke Co., 3 Cir., 191 F. 2d 563, 567; Kansas Mill. Co. v. N. L. R. B., 10 Cir., 185 F.2d 413, 415. Thus a general allegation in the original complaint that the employer had interfered with employees in the exercise of their § 7, 29 U.S.C.A. § 157, rights by restraining and coercing them, discriminating in regard to hire and tenure and refusing to bargain in good faith, was subsequently—more than six months after the date of the alleged violation—amended to allege discharges of particular employees for legitimate union and strike activities. Kansas Milling Co. v. N. L. R. B., 10 Cir., 185 F.2d 413, 416.

■ We feel that the enlarged complaint can be justified here on the "relating back" theory in so far as the additional victims of the discriminatory treatment are concerned. Here the violation and the facts constituting it remained the same as in the original charge; only the number of those discriminated against was altered. This addition certainly could not prejudice the employer's preparation of his case, or

mislead him as to what exactly he was being charged with. Cf. N. L. R. B. v. Reliable Newspaper Delivery, Inc., 3 Cir., 187 F.2d 547, 550 n. 3; Consolidated Edison v. N. L. R. B., 305 U.S. 197, 238, 59 S.Ct. 206, 83 L.Ed. 126. The same is true of the additional allegation in the final complaint that action previously categorized as a violation of §§ 8(a) (1) and (3) constituted also a violation of § 8(a) (2). This was a change in legal theory only, and not in the nature of the offense charged. Cusano v. N. L. R. B., 3 Cir., 190 F.2d 898, 903. As to the charge of illegality concerning the 1948 contract, we agree that, so long as that contract continued in force, if actually illegal, a continuing offense was being committed by the employer. Since the contract was still in force at the time of filing, the six months' limitation period of § 10(b) had not even begun to operate. See Superior Engraving Co. v. N. L. R. B., 7 Cir., 183 F.2d 783, 790; Katz v. N. L. R. B., 9 Cir., 196 F.2d 411. The complaint was, then, in all respects valid.

■ 2. This brings us to the substance of the complaint. The employer admits giving union members retroactive wage increases and vacation benefits while denying them to non-union members. It claims, however, that such action had neither the purpose nor the effect required by § 8(a) (3), i. e., to encourage membership in any labor organization; that the Board failed to prove that purpose and effect, and that, therefore, the action cannot be sanctioned. Loner, the original complainant, it is argued, had already unsuccessfully done everything he could to enter this union; his membership application was pending at the time of the violation; nothing the employer could do would amount to further "encouragement" of that membership. The employer relies heavily on N. L. R. B. v. Reliable Newspaper Delivery, Inc., supra. There an employer acceding to the requests of a minority union, bargaining on a members-only basis, gave union members discriminatory advantages over non-union members. The Court held that such discrimination could not have the necessary effect of encouraging union membership because the union was a closed one, with membership passing exclusively from father to son. There is, however, one significant distinction between that case and this one. There discrimination resulted from what the court considered the entirely legal action of the minority union in asking special benefits for its members only. The union made no pretense of representing the majority of employees or of being the exclusive bargaining agent in the plant. The other non-union employees, reasoned the Court, were quite able to elect their own representative and ask for similar benefits. Not so here. The union here represented the majority of employees and was the exclusive bargaining agent for the plant. Accordingly, it could not betray the trust of non-union members, by bargaining for special benefits to union-members only, thus leaving the non-union members with no means of equalizing the situation.

■ True, the Third Circuit in the Reliable case went on to say that, even assuming unfair discrimination, it was up to the Board to prove that this discrimination had the purpose and effect of encouraging union membership. Several cases, including one of our own, N. L. R. B. v. Air Associates, 2 Cir., 121 F.2d 586, 592, were cited there to support this interpretation of § 8(a) (3). But see our explanation of that case in N. L. R. B. v. Cities Service Oil Co., 2 Cir., 129 F.2d 933, 937. The Board, on the other hand, here cites Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, 800, 65 S.Ct. 982, 89 L.Ed. 557, for the proposition that no statistical proof of an actual "encouraging" effect on union membership need be shown where the discriminatory conduct by its nature "tends to encourage or discourage" union membership. See also N. L. R. B. v. John Engelhorn & Sons, 3 Cir., 134 F.2d 553, 557; N. L. R. B. v. Illinois Tool Works, 7 Cir., 153 F.2d 811, 814; N. L. R. B. v. Ford, 6 Cir., 170 F.2d 735, 738.

■ Our own view comes to this: Discriminatory conduct, such as that practiced here, is inherently conducive to increased union membership. In this respect, there can be little doubt that it "encourages" union membership, by increasing the number of workers who would like to join and/or their quantum of desire. It

may well be that the union, for reasons of its own, does not want new members at the time of the employer's violations and will reject all applicants. But the fact remains that these rejected applicants have been, and will continue to be, "encouraged," by the discriminatory benefits, in their desire for membership. This backlog of desire may well, as the Board argues, result in action by non-members to "seek to break down membership barriers by any one of a number of steps, ranging from bribery to legal action." A union's internal politics are by no means static; changes in union entrance rules may come at any time. If and when the barriers are let down, among the new and now successful applicants will almost surely be large groups of workers previously "encouraged" by the employer's illegal discrimination. We do not believe that, if the union-encouraging effect of discriminatory treatment is not felt immediately, the employer must be allowed to escape altogether. If there is a reasonable likelihood that the effects may be felt years later, then a reasonable interpretation of the Act demands that the employer be deemed a violator. To this extent, we find ourselves in disagreement with the Reliable case, and do not hesitate to hold the action here violative of both § 8(a) (1) (2) and (3).

The employer makes one additional —and feeble—argument, which we speedily reject, based upon the "closed-shop" proviso to the Wagner Act, § 8(3), in effect at the time of these violations. That proviso allowed an employer to agree with a union "to require as a condition of employment membership therein". Since discriminatory hiring and firing were thus legal in a closed shop, says the employer, a lesser discrimination—i. e., in retroactive payment of wages, vacation benefits, etc.—was also legal. Reason as well as statutory text disagree. The proviso was a specific exception to what would otherwise have been a violation of the general anti-discrimination rule laid down in old § 8(3). The purpose of the closed-shop proviso was to permit what was then thought to be a unifying influence in labor relations, i. e., one union representing and supported by all employees bargaining with one employer. No such rational justification for discrimination in working conditions exists; the effect of this kind of discrimination is indisputably discordant, divisive, and conducive to conflict and bad feeling in the plant. We think that Congress never meant, by implication or otherwise, to allow such a patently unfair and labor-strife-provoking policy in industries under its control.

3. The last point of substance we must consider concerns the alleged violations of § 8(a) (1) (2) (3) stemming from the 1948 contract which contained a union security clause. At that time, no such clause could be executed unless the majority of employees in a Board-conducted union-shop election authorized it. Here, no such election was held. The contract did contain a "saving clause" reprinted in the margin[1]—that, "should * * * any provision of this agreement be in conflict with federal or state law or regulation then such provision shall continue in effect only to the extent permitted." The effect of such a clause, however, as the Board noted, was not to defer the application of the union-security provision but only to postpone "the issue of its legality for future determination by some proper tribunal." Very recently, in N. L. R. B. v. Red Star Express Lines, 2 Cir., 196 F.2d 78, we held that a similar "saving clause"—if anything a more cautious one, providing that provisions of questionable legality under the 1947 amendments to the Labor-Management Act should not go into effect until held legal— would not suffice to prevent the agreement from constituting an unfair labor practice. Our reason was that an employee cannot be expected to predict the validity or invalid-

---

1. "To the best knowledge and belief of the parties this contract now contains no provision which is contrary to federal or state law or regulations. Should, however, any provision of this agreement, at any time during its life, be in conflict with federal or state law or regulation then such provision shall continue in effect only to the extent permitted. In the event of any provision of this agreement thus being held inoperative, the remaining provisions of the agreement shall, nevertheless, remain in full force and effect."

ity of particular clauses in the contract, and will feel compelled to join the union where a union-security clause of questionable validity exists, if only as a hedging device against a possible future upholding of the clause. Only a specific provision deferring application of the union-security clause will immunize the contract against this illegality. The same principles serve to void the union-security provisions here.

As a result of finding the union-security provision illegal, the Board ordered the employer to cease and desist from enforcing this contract or any other with this or any other union, or from recognizing any union's representative status in any way until duly certified by the Board. By these injunctive provisions—§§ 1(b) (c) (d) and 2(b) of the Board's order—the employees lose all their rights under the 1948 contract —wages, hours, benefits, etc.—and are prevented from enforcing any new ones. The illegality in this contract lay solely in the union's failure to secure prior approval from a majority of employees for the union-security clause—a requirement since abolished by Congress in 1951 as burdensome and unnecessary. That approval can. no longer be secured at this late date, nor is it necessary to any new contract.

█ The Board argues that the entire contract must be voided and collective bargaining relations suspended, or otherwise the union will "be permitted to continue to enjoy a representative status strengthened by virtue of the illegal contract." The Board also says that the union's present position was illegally advanced by the employer's discriminatory treatment of nonunion employees. See Katz etc. v. N. L. R. B. supra. Nevertheless we believe the remedy works out too harshly here. The union has asked the Board for consideration of its petition for certification and has been refused, with the advice that no such action will be taken until the Board's order has been fully complied with. Compliance must come from the employer. Meanwhile this or any other union, and consequently all the employees, are in a box and cannot enforce any rights or demands through collective bargaining. The employer, the sole

party against whom the Board proceeded, gains through this total lifting of any contractual restraints on its action. The union here involved claims it has entered into a new contract with the employer which, it says, abolished all taint of illegality contained in the earlier one. This the Board does not deny, nor do we pretend to pass on the question here. We do not, however, think that the possible danger to employees of allowing some collective bargaining relations with this union outweighs the substantial harm to them in taking away for an indefinite period all collective bargaining rights. We have therefore decided to refuse to enforce those parts of the Board's order which prohibit any contractual relations between the employer and this or any other union until such time as the Board gets around to considering and making a decision on this or any other union's petition for certification. If, during this interval, the employer should do or agree to do anything that would illegally discriminate against any employees or in any other way violate the remaining portions of the Board's order, the Board is still free to prosecute the employer for contempt.

Modified. Enforced as modified.

CHASE (concurring in part and dissenting in part).

I agree with my brothers that the unfair labor practices found were established by the evidence and differ with them only in that I would enforce the order as made by the Board. As was said in International Association of Machinists, etc., v. National Labor Relations Board, 311 U.S. 72, 82, 61 S.Ct. 83, 89, 85 L.Ed. 50, "It is for the Board not the courts to determine how the effect of prior unfair labor practices may be expunged. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 576, 82 L.Ed. 831; National Labor Relations Board v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 311, 84 L.Ed. 396." Indeed, it is not because the remedy itself is wrong but only because the Board has not acted upon the union's petition for certification, while the unfair labor practices of which the union is in part the beneficiary remain in

effect, that my brothers are withholding full enforcement. That seems to be such an unjustifiable interference with the power of the Board to exercise its sound discretion that I cannot subscribe to it.