## NATIONAL LABOR RELATIONS BOARD v. MARTIN et al.

### No. 13690.

United States Court of Appeals
Ninth Circuit.

Oct. 19, 1953.

George J. Bott, General Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Elizabeth W. Weston, Sonja Goldstein, Attorneys, National Labor Relations Board, Washington, D. C., and Daniel J. Harrington, Attorney, N. L. R. B., Los Angeles, Cal., for petitioner.

R. D. Sweeney and J. E. Simpson, Los Angeles, Cal., for respondent.

Before HEALY and POPE, Circuit Judges, and JAMES M. CARTER, District Judge.

HEALY, Circuit Judge.

This matter is before us on petition of the National Labor Relations Board for enforcement of an order directed against respondents. The case relates to two of the latters' employees, Frederick and Leeper. Agreeably with the report of the trial examiner, the Board found that Frederick was discharged in violation of § 8(a) (1) and (3) of the Act because of his activities on behalf of United Automobile Workers, which had undertaken to organize respondents' shop; and that Leeper was discharged for having led a group of employees in concerted activity protected by § 7 of the Act.

Respondents urge that the findings are not substantially supported by the evidence when considered in its entirety. They contend also that the proceeding is barred by the six-month limitation of § 10(b), which in substance provides that no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing and service of the charge. We turn first to the latter contention.

The alleged unfair labor practices occurred in December of 1950, and the charge was filed February 1, 1951. The complaint issued November 14, 1951. The charge, lodged by the Union, recited that Frederick and Leeper were discharged on December 28, 1950, "upon the grounds that these employees were engaging in union organizational activities for the purpose of discouraging the formation of the Union." The complaint states that the two employees were discharged "for the reason that they engaged in concerted activities with other employees for the purposes of collective bargaining and other mutual aid and protection." Thus charge and complaint alike identified the allegedly illegal transactions by giving the names of the individuals concerned and the date of their dismissal. The difference between them is one of detail as regards the description of the activity engaged in.

The circuit courts are generally agreed that the complaint under the amended Act may properly deviate from the charge, provided only that the violations included in the complaint did not

occur prior to the six months' period of limitation fixed by the filing and service of the charge. As the rule is phrased in N. L. R. B. v. Kingston Cake Co., 3 Cir., 191 F.2d 563, 567, it is not requisite that the charge define the issues to be tried with the precision normally sought in pleadings in lawsuits. And as noted in N. L. R. B. v. Gaynor News Co., 2 Cir., 197 F.2d 719, 721, the amended § 10(b) "has been uniformly interpreted to authorize inclusion within the complaint of amended charges—filed after the six months' limitation period—which 'relate back' or 'define more precisely' the charges enumerated within the original and timely charge. The 'relating back' doctrine for this purpose has been liberally construed to give the Board wide leeway for prosecuting offenses unearthed by its investigatory machinery, set in motion by the original charge."

This court, although it has not spoken upon the precise point raised here, has held unobjectionable a complaint which described with particularity violations stated in the charge in only very general terms. Katz v. N. L. R. B., 9 Cir., 196 F.2d 411, 415. The court in that case cited with approval Cusano v. N. L. R. B., 3 Cir., 190 F.2d 898, 903, involving a variance in description indistinguishable from that existing here. In Cusano the variance was held inconsequential as being "at most, a slight change in the legal theory." Respondents take their stand principally on the holding in Joanna Cotton Mills Co. v. N. L. R. B., 4 Cir., 176 F.2d 749.[1] That decision, however, has not been followed in other circuits in comparable cases arising under the amended Act. We conclude that the charge in the case before us supplied an adequate foundation for the complaint and that petitioners suffered no prejudice in consequence of such variation as existed.

As regards the merits, respondents' position is that Frederick was discharged for cause and that Leeper voluntarily quit his job. While the record would permit of such an interpretation it certainly does not compel it; and we are constrained to hold that the inferences drawn by the examiner and the Board as respects the motivating cause are warranted by the evidence.

Except for two short layoffs of no significance here, Frederick had worked steadily for respondents from 1946 until his discharge in 1950. In the autumn of the latter year he became interested in the United Automobile Workers Union which was then embarking on a campaign to organize the plant. He served the Union as a sort of one-man organizing committee. On December 27 and 28 he brought 100 designation cards into the shop, and with the aid of a fellow employee or two distributed them among the employees for signature. On the 28th cards signed by 55 employees—about half the working force—were returned to him. Frederick testified that Foreman Gilly saw him handing out cards and that he jokingly asked Gilly to sign one, but that the latter made no comment. At the end of the December 28 shift Frederick was told by Gilly that Nemec (one of the respondents) had complained about Frederick's laxity in keeping his machine clean, and that for this reason Frederick was discharged.

Foreman Gilly had supervised Frederick's work throughout his employment with respondents. He testified that much of Frederick's activity was in machining carbon, which is a dirty job, and that Frederick had complained that if he had to work much longer on carbon he would quit. According to Gilly, Frederick persistently failed to clean the machine on which he worked. Gilly testified also that on December 27 Frederick, with another employee, was using a sledge hammer to force a drum on an axle, and Gilly told them not to do this. However, a few minutes later Gilly discovered that they were still using the sledge hammer and instructed them to

---

1. They cite, also, Indiana Metal Products Corp. v. N. L. R. B., 7 Cir., 202 F.2d 613, but that case, as we read it, affords no support for their position.

use a wooden block to take the impact of the blows. There was evidence which in the examiner's view clearly showed that this incident took place, not on December 27 as stated by Gilly, but about a week earlier. On December 28, according to Gilly, another incident occurred relating to the breaking by Frederick of a casting for a toolholder.

Gilly admitted that Frederick may have offered him a union designation card for signature, but denied being aware that Frederick was engaged in any sort of union activity. The examiner in his report states that Gilly did not impress him as a witness upon whose testimony much reliance could be placed. As an example, he points out that only on cross-examination did it develop that the occasions on which Gilly criticized Frederick for failure to clean his machines had occurred at least two and perhaps three years prior to the discharge.

We are impressed with the examiner's analysis of the testimony relating to the case of Frederick and are not persuaded that his finding that the latter was discharged because of his activity in securing union adherence among the other employees is inadequately supported. Respondents urge that the record shows no history of anti-union bias on their part. However, incidents occurring subsequent to the discharge of Frederick and Leeper tend to disclose an earnest desire on the part of respondents that their employees not select a bargaining representative. On the 29th of December the Union filed with the Board a petition seeking an election and certification as bargaining agent of the workers in the plant. In discussions with the men during this period respondent Martin explained that the Company could not afford to meet the Union's anticipated demands for higher wages, and Nemec told one of the men that he did not "see where the unions were going to do anybody any good in our shop." We think it was not unreasonable to believe, as the examiner and the Board did, that the respondents would regard with disfavor activities of any of their men looking toward the organization of the plant.

This brings us to Leeper. Leeper was a welder of 22 years' experience and concededly an excellent worker. He had been with the respondents from October 1950 until December 28th of that year, when, so the Board found, he was discharged. On December 27 Leeper was working on the night shift, which began at 5 p. m. That night the welders on the shift, 15 in number, approached the night superintendent and spoke to him relative to securing a bonus for night work and payment for their lunch hour, Leeper acting as spokesman for the group. The superintendent explained that these were matters for consideration of the partners, and Nemec was called in. He testified of his learning that the welders were in an "uproar," so he went over to investigate. Leeper told him, so Nemec testified, that he wanted a showdown on lunch hour pay and that if it was not granted the men would walk out. One or more of the welders at this point, according to Nemec, told Leeper that he was speaking only for himself. According to a witness still in respondents' service as of the time of the hearing, Nemec said that he would check into the bonus matter, and Leeper replied that he would give him 24 hours in which to reply, and if an answer was not then forthcoming he, Leeper, was quitting.[2] The discussion ended, Leeper went back to work and continued on the job for the remainder of the shift. On leaving the plant he did not, as was the customary procedure for employees quitting permanently, take his tools with him.

Around four o'clock that afternoon, when Leeper had left his home for the plant taking with him his lunch, Nemec came to the house and was told by Mrs. Leeper that her husband had gone to work. Nemec handed her Leeper's paycheck to date and told her Leeper had quit, whereupon the wife expressed surprise. Meanwhile Leeper had returned

2. Leeper died prior to the hearing, hence we do not have his version of the occurrence.

to the plant but was not allowed to go back to work. In the next few days he made several other and fruitless attempts to get back on the job.

On this showing the Board rejected respondents' claim that Leeper had voluntarily terminated his employment by quitting. It agreed with the examiner that the employee had been discharged because of the part he had played in the welding shop incident, which was thought to be concerted activity protected by § 7 of the Act as well as by § 8(a) (1).[3] Compare N. L. R. B. v. Globe Wireless, 9 Cir., 193 F.2d 748, 750. The only dispute as to this phase of the case is whether Leeper quit or whether he was discharged. The facts bearing on the point are virtually undisputed, and we are satisfied that the inference of discharge is amply supported.

Except as noted herein, a decree will be entered enforcing the Board's order as prayed.

---

3. We consider it unnecessary to determine whether, as the Board found, respond-

ents' conduct was violative also of § 8 (a) (3) of the Act.