**NATIONAL LABOR RELATIONS BOARD**
v.
**WATERFRONT EMPLOYERS OF WASHINGTON et al.**
No. 13671.

United States Court of Appeals
Ninth Circuit.
April 6, 1954.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Arnold Ordman & Margaret M. Farmer, Attys., N.L.R.B., Washington, D. C., for petitioner.

Bogle, Bogle & Gates, Edward G. Dobrin, J. Tyler Hull, Zabel & Poth, Philip J. Poth, Bassett & Geisness, Seattle, Wash., Gladstein, Andersen & Leonard, San Francisco, Cal., for appellees.

Before HEALY and BONE, Circuit Judges and LEMMON, District Judge.

BONE, Circuit Judge.

The National Labor Relations Board petitions for enforcement of an order issued by it against Waterfront Employers of Washington (herein "WEW"), Local 19, International Longshoremen's and Warehousemen's Union (herein "Local"), and International Longshoremen's and Warehousemen's Union (herein "ILWU"), with which Local is affiliated. The Board's Decision and Order embodies all of the facts of this case, and is set forth in 98 N.L.R.B. 284. The Board's supplemental Decisions and Orders in the case may be found in 101 N.L.R.B. 195 and 101 N.L.R.B. 770. In this opinion we advert to only such facts

as we deem necessary to point up the issues for decision here.

The unfair labor practices found by the Board involved the execution by the parties of two hiring agreements and the operation of a Seattle hiring hall for longshoremen and dock workers pursuant to those agreements. The first of these two agreements, the "Pacific Coast Longshore Agreement" (herein the "Coast Agreement") was negotiated by ILWU and the Waterfront Employers Association of the Pacific Coast (now succeeded by the Pacific Maritime Association, herein "PMA") late in 1948. The Coast Agreement named PMA and other waterfront employers associations, including respondent WEW, as parties thereto. WEW authorized the execution of the Agreement and ratified it.

The Coast Agreement was discussed in our recent case of National Labor Relations Board v. International Longshoremen's & Warehousemen's Union, 9 Cir., 1954, 210 F.2d 581, 583. The portions of the Agreement concerning hiring halls were succinctly summarized in that opinion as follows:

> "Control of the hiring hall is vested in a Port Labor Relations Committee * * * composed of equal numbers of employer and labor representatives. Expenses are paid equally by each of the two groups. Personnel are appointed by the Committee except for the dispatchers who are selected by the International by means of elections. These dispatchers are subject to removal by the Committee for cause. The business of the hall is chiefly the dispatching of registered longshoremen upon request of the Employers, who are required to obtain all longshore help through the hall. Preference [in dispatch] is granted first to registered longshoremen who are members of the Local, second to nonunion registered longshoremen, and third to non-registered longshoremen."

Pursuant to the Coast Agreement hiring halls are established at Seattle and other Pacific Coast ports. It is the operation of the Seattle hiring hall with which we are here concerned.

The second of the two hiring agreements involved in this case was executed by respondents Local and WEW in February of 1949 and was called the "Dock Workers' Agreement for the Port of Seattle" (herein the "Dock Agreement"). As its title indicates, the Agreement covered dock work and dock workers in Seattle. In general, dock work consists of the movement of cargo to and from the docks; longshore work consists of the movement of cargo between ship and dock. The Dock Agreement provided for the hiring of Seattle dock workers through the same hiring hall and by the same hiring arrangement as was provided for longshoremen in the Coast Agreement.

WEW is an incorporated association of waterfront employers in the State of Washington, with its principal office in Seattle. During the times pertinent herein WEW served as paymaster for its member companies and, as indicated by its authorization and ratification of the Coast Agreement and its execution of the Dock Agreement, represented such companies for collective bargaining purposes. The Board found that WEW was an "employer" within the meaning of § 2(2) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq., (herein "the Act"), and that finding is not challenged here.

On the Port Labor Relations Committee which had charge of the Seattle hiring hall were three representatives of the employers, chosen by PMA, and three union representatives, chosen by Local, to which ILWU had delegated its rights and responsibilities under the Coast Agreement. WEW was not directly represented on the Committee, although its president, Daryl Cornell, served on the Committee as PMA representative. The day-to-day operation of the hiring hall was conducted by Chief Dispatcher Laing, who was selected by Local 19. The employers' share of the expenses of the several hiring halls on the Pacific Coast was

collected by PMA from its member companies and other stevedoring companies on the waterfront. Part of these funds were deposited to the account of WEW, which in turn used them to pay the employers' share of the Seattle hiring hall expenses.

So far as it is here necessary to state, the Seattle hiring hall was operated as follows: The Port Labor Relations Committee had control of the registration lists for the hiring hall and power to make additions to or subtractions from the lists. The names of registered longshoremen who were union members and were not members of regular longshore "gangs" were listed on a board in the hiring hall. Beside each of such names was a small hole into which a "plug" could be fitted. Each longshoreman whose name was on this board had to "plug in" each day to indicate his availability for work. There was another board where "gangs" of longshoremen who were union members were listed. Members of gangs could secure work simply by calling the hiring hall to learn if their "gangs" were to be dispatched. The gangs and individual longshoremen were each dispatched in rotation from their respective boards.

The Board found that in the course of the operation of the Seattle hiring hall two longshoremen, Albert G. Crum and Clarence Purnell, then members of Local, were discriminatorily denied dispatch. Crum had worked regularly as a longshoreman from 1936 to 1944. Thereafter he divided his time between longshore work, a job for a stevedoring company which was outside the jurisdiction of respondent unions, and a farm which he owned in Idaho. In December of 1948 Crum was "fined" $2400 by Local for not standing his share of picket duty during a strike, and was informed that he could work for 30 days and no longer unless he paid this fine. Crum worked with the gang of which he was a member until January 27, 1949, when the entire gang

was laid off. During the next few days Crum telephoned the hiring hall to find out if his gang had been dispatched. One day after the expiration of the 30-day period, when he called the dispatcher's office, Crum was told: "Crum, there is no need of your calling up any more. There is a bug behind your name, and you won't be dispatched with your gang until the fine is paid."[1] Thereafter Crum requested Daryl Cornell, who was PMA Manager for Seattle, President of WEW, and a member of the Seattle Port Labor Relations Committee, to see what he could do for him on the Committee, and Cornell agreed. Crum also contacted representatives of shipping companies in Seattle, who told him he would be hired if he was dispatched by the hiring hall. On April 20, 1949, on motion of Local, the Port Labor Relations Committee cancelled Crum's registration as a longshoreman on the ground that he was only a casual worker.

Purnell had worked intermittently as a longshoreman from 1942 to the fall of 1948. He was not a member of a regular gang. He, like Crum, was fined $2400 by Local on or about January 3, 1948 for not standing his share of picket duty during a strike, and was told he could work for just 30 days without paying this fine. He did not work during the 30-day period because he was suffering from arthritis. Thereafter he made no attempt to plug in at the hiring hall because, he said, he knew it was useless when he had not paid his fine. In January of 1949 he asked Dispatcher Laing for a statement of availability to assist him in getting unemployment compensation or another job. Laing refused and told him he had only 30 days to work unless he paid his fine. Purnell also asked President Cornell of WEW if his record was clear with the employers and was informed that it was. On February 3, 1949 Purnell again asked Dispatcher Laing for a statement of availability. Again Laing refused. Laing told Purnell he

---

[1] A "bug" is a small colored tack placed by the name of a longshoreman on the dispatch board, giving notice that he is denied dispatch for nonpayment of union dues, fines, etc.

thought his "time was up"; that he could no longer work until his fine was paid. Laing testified that Purnell's name was never removed from the dispatch board and that if he had at any time plugged in he would have been dispatched.

The Board concluded that by executing and enforcing the preferential hiring provisions of the Coast and Dock Agreements WEW violated § 8(a) (1), (2) and (3) of the Act;[2] that WEW was responsible for discriminatorily denying employment to Albert Crum and Clarence Purnell, and therefore was guilty of violating § 8(a) (1) and (3) of the Act; that by the denial of dispatch privileges to Crum and Purnell Local and ILWU caused WEW and its member employers to discriminatorily deny employment to Crum and Purnell, in violation of § 8(b) (1) (A) and (b) (2) of the Act;[3] and that Local violated § 8(b) (1) (A) and (b) (2) of the Act by executing and enforcing the Dock Agreement.

In substance the Board's order (1) requires the respondents who were parties to the Coast Agreement to cease maintaining in effect or enforcing the prefer-

tial hiring provisions of that Agreement; (2) requires the respondents who were parties to the Dock Agreement to cease maintaining in effect, or enforcing, the preferential hiring provisions of that Agreement; (3) requires respondent unions to cease enforcing either of the said Agreements, whether or not they were parties thereto; (4) requires all respondents to cease and desist from entering into, renewing, or enforcing any like or related agreements containing union-security provisions not in conformity with § 8(a) (3) of the Act; (5) requires all respondents, jointly and severally, to make whole Crum and Purnell for loss of pay by reason of the discrimination against them; (6) requires WEW to cease and desist from interfering with, restraining or coercing employees of its employer members in the exercise of the rights guaranteed in § 7 of the Act; (7) requires WEW to notify the Seattle Port Labor Relations Committee and hiring hall dispatchers (a) that the preferential hiring provisions of the Coast and Dock Agreements are not to be given effect, (b) that there is to be no discrimination

---

2. "Sec. 8. (a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: * * *".

At the times pertinent herein § 8(a) (3) of the Act provided as follows:

"Sec. 8. (a) It shall be an unfair labor practice for an employer—

* * * *

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8(a) of this Act as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later,

(i) if such labor organization is the representative of the employees as provided in section 9(a), in the appropriate collective-bargaining unit covered by such agreement when made; and (ii) if, following the most recent election held as provided in section 9(e) the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to authorize such labor organization to make such an agreement; * * *".

In 1951 the requirement of an election to authorize the making of a union security agreement was eliminated. 65 Stat. 601. The present § 8(a) (3) of the Act may be found at 29 U.S.C.A. § 158(a) (3).

3. "§ 8.
* * * * *

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: * * *

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) * * *".

**952**

against persons who are not members of respondent unions in dispatching workers from the hiring hall, and (c) that Crum and Purnell are to be given dispatch privileges on request, on a nondiscriminatory basis; (8) requires WEW to notify each of its employer members of the Board's order, and request each to take necessary steps to insure that dispatchers will not discriminate against applicants for work because of lack of membership status in the respondent unions; (9) requires WEW to invoke such powers and rights as it has as to each of its employer members who employs workers covered by the Coast and Dock Agreements or who uses the Seattle hiring hall, in order to discharge its (WEW's) financial obligations under the Board's order, and to secure co-operation in carrying out the order; (10) requires WEW to post appropriate notices; (11) requires respondent unions to cease requiring or inducing the dispatchers to discriminate against Crum or Purnell, or any other employee or prospective employee, because of lack of membership status in the respondent unions; (12) requires respondent unions to cease from in any other manner causing or attempting to cause employers to discriminate in the hire and tenure of employment of any employee, in violation of § 8(a) (3) of the Act; (13) requires respondent unions to cease from in any manner restraining employees or prospective employees using the hiring hall in the exercise of the rights guaranteed in § 7 of the Act; (14) requires respondent unions to give the same notices to the Port Labor Relations Committee and the dispatchers as are required of WEW, to give the same notices to employees who use the hiring hall, and in addition to notify respondent unions' representatives on the Port Labor Relations Committee to take necessary action to restore Crum to the registration list.

I

■ None of the respondents deny that the preferential hiring provisions of the Coast and Dock Agreements were violative of § 8 (a) (3) of the Act. The provisions were illegal due to lack of authorization by a vote of the employees, as was required by § 8(a) (3) of the Act at the time of their execution (see footnote 2, supra), and for the further reason that the preference in employment given to union members transcended the permissible limits of a union-security agreement under § 8(a) (3). So far as the merits of the case are concerned, all three respondents attack one or another phase of the Board's findings that Crum and Purnell were discriminatorily denied dispatch from the hiring hall. Both WEW and ILWU contend that, in any event, Crum is not entitled to reinstatement or to back pay for the period after April 20, 1949, when his name was removed from the registration list of the hiring hall because he was a casual worker. The same respondents contend that if there was any discrimination against Crum and Purnell, they were not responsible for it. WEW contends that the Board erred in finding that it *enforced* the Coast and Dock Agreements, and in holding it liable, jointly and severally with respondent unions, for back pay to Crum and Purnell.

■■ We take up first the contention that the Board erred in finding that Crum and Purnell were denied dispatch for nonpayment of fines assessed by Local. With respect to Crum, the finding of the Trial Examiner and the Board is clearly correct. Crum was notified by Local at the time he was fined that he had 30 days in which to work without paying his fine. He applied for work at the hiring hall at the end of the 30 days and was told he was "bugged" and would not be dispatched until his fine was paid.

As to Purnell the Trial Examiner, while indicating "large doubts" as to the truth of Dispatcher Laing's testimony that Purnell would have been dispatched notwithstanding his failure to pay his fine if he had requested it, reasoned that there could be no finding of a refusal to dispatch Purnell when he had never asked to be dispatched. The Board disagreed, relying upon the fact that it was the settled practice, as shown in the case

of Crum, to refuse dispatch to union members 30 days after assessment of a fine against them if the fine was not paid, and that Purnell was told as much by Dispatcher Laing. The Board concluded, and we agree, that under these circumstances the futile gesture of applying for dispatch was not a prerequisite to a finding of discrimination. National Labor Relations Board v. International Association of Machinists, 9 Cir., 203 F.2d 173; National Labor Relations Board v. Swinerton, 9 Cir., 202 F.2d 511.

On the question whether Crum has a right to reinstatement and to back pay for the period after April 20, 1949, the day on which his name was removed from the registration list of the hiring hall on the purported ground that he was a casual worker, respondents ILWU and WEW again have the support of a favorable finding by the Trial Examiner. The Examiner found that the deregistration was in good faith and in accordance with Port Labor Relations Committee practice, and accordingly held that it cut off Crum's right to reinstatement and back pay. It is clear enough that there was a practice of deregistering casual longshore workers and that, judging by his earnings, Crum fell within that category. The Board, however, in overruling the Trial Examiner, relied upon the facts that the deregistration practice was of a rather hit-and-miss character; that in applying it the Port Labor Relations Committee retained a good deal of discretion; that Crum had been a "casual" worker long before his deregistration; that it was Local which moved for his deregistration; that the deregistration came on the heels of the discrimination against Crum and in some respects was not in accordance with standards normally utilized by the Committee. Having given the Trial Examiner's finding the careful consideration to which it is entitled under the principles laid down in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, we nonetheless conclude that the contrary finding of the Board is supported by substantial evidence on the record considered as a whole, and must therefore be sustained. Cf. National Labor Relations Board v. Akin Products Co., 5 Cir., 209 F.2d 109, 110, 111. The facts that Crum and Purnell were both casual workers and that Purnell was in bad health are, of course, among the factors to be taken into account in the further proceedings required to determine the amount of the awards to Crum and Purnell to make them whole for what they lost by reason of the discrimination against them.

We turn next to WEW's contention that it is in no way responsible for the discrimination against Crum and Purnell. The argument is that the denial of dispatch to Crum and Purnell was purely the result of unilateral action of the respondent unions and the dispatcher, acting as agent of the unions; that the discrimination can in no sense be attributed to WEW, which was not directly represented on the Seattle Port Labor Relations Committee and had no part in the administration of the hiring hall.

We think the Board correctly decided otherwise. WEW, it will be recalled, was the paymaster of employers of longshoremen in Washington and represented such employers for collective bargaining purposes. The Coast Agreement named WEW as a party thereto, as representative of its member companies. WEW authorized execution of that Agreement and ratified it. In the Coast Agreement WEW, as representative of its member companies, agreed that longshoremen would be hired only through a hiring hall organized and operated pursuant to that Agreement. WEW also agreed that preference should be accorded members of ILWU (which membership was derived from membership in local unions affiliated with ILWU, including respondent Local) in dispatching workers from the hiring hall. The Board found that the word "member" in the hiring preference provision of the Coast Agreement meant "member in good standing" and that finding is not challenged here. Thus, the effect of the Agreement was to con-

fer on the hiring hall the power to deny longshoremen employment by refusing them dispatch, with directions to exercise that power so as to prefer members in good standing of respondent unions.

Having agreed to and maintained this discriminatory hiring arrangement, WEW is accountable for its results. It was in strict accordance with this hiring arrangement that Crum and Purnell were denied employment as longshoremen. Because they did not comply with a requirement imposed by Local upon its members, Crum and Purnell lost their good standing union membership. When they lost that *status* they lost the dispatch privileges that went with it. The effect of withdrawing these dispatch privileges was to deny Crum and Purnell employment as longshoremen with WEW's member companies, for employment with such companies could be obtained only by being dispatched from the hiring hall. It is no defense to say that WEW did not consent to the specific rule laid down by Local pursuant to which Crum and Purnell were deprived of good standing union membership and dispatch privileges, or that WEW did not know of the refusal to dispatch them. WEW was not altogether ignorant of the discriminatory practices of the hiring hall, for WEW President Cornell testified that he had heard "rumors" of the "bugging" procedure whereby union members were denied dispatch for failing to comply with requirements imposed by Local. And in any event, WEW must have known, and doubtless did know that Local and ILWU, like all other unions, had *some* requirements for good standing membership, and that such instances of discrimination as those involving Crum and Purnell were therefore extremely likely, if not inevitable. Since the discriminatory denial of longshore jobs to Crum and Purnell was the direct result of the hiring arrangement agreed to and maintained by WEW, we think with the Board that WEW was responsible for such discrimination. The discrimination tended to encourage good standing membership in respondent unions and was therefore vio-

lative of §§ 8(a) (1) and 8(a) (3) of the Act. Radio Officers' Union of Commercial Telegraphers Union, A. F. L. v. National Labor Relations Board, 347 U.S. 17, 39–42, 74 S.Ct. 323.

ILWU's contention that it is not responsible for the action taken by Local and Dispatcher Laing against Crum and Purnell raises a question identical to that disposed of in our recent case of National Labor Relations Board v. International Longshoremen's and Warehousemen's Union, supra, 9 Cir., 210 F.2d 581, and for the reasons therein stated the contention is rejected.

■ The finding of the Trial Examiner and the Board that WEW enforced the Coast and Dock Agreements is challenged by WEW on the ground that there was no allegation to that effect in the Board's complaint and that there is no evidence to sustain such a finding. WEW seems to think that it was incumbent upon the Board to allege and prove that WEW or its representatives participated in the actual operation of the hiring hall. We do not agree. The complaint alleged that WEW discriminated against employees in regard to hire and tenure of employment and interfered with, restrained and coerced them in the exercise of their rights under § 7 of the Act, by "acquiescing in and assenting to a hiring hall arrangement * * * whereby longshoremen and dock workers were hired through a central hiring hall, and whereby Respondent ILWU and Respondent Local 19 were placed in a position to determine who might be dispatched and were allowed to actively enforce the preferential employment provisions [of the Coast and Dock Agreements], in the course of which control, they refused to dispatch Albert G. Crum and Clarence Purnell * * *." This was a sufficient allegation of WEW's "enforcement" of the Agreements. WEW "enforced" the agreements if it cooperated and assisted in giving them effect. If WEW bound its members to agreements whereby they were required to do all their hiring through a hiring hall in which union members were to

have preferential dispatch privileges, and if WEW thereafter maintained the agreements and acquiesced in the hiring arrangement established pursuant thereto, so that its member companies did all their hiring through the established hiring hall, with the result that some persons were discriminatorily denied employment, WEW would certainly seem to have had a hand in the "enforcement" of the agreements. Cf. National Labor Relations Board v. Z. H. McGraw & Co., 6 Cir., 206 F.2d 635. And substantial evidence on the record considered as a whole sustains the finding that WEW did participate in the enforcement of the Dock and Coast Agreements in the manner alleged in the complaint.

█ We are asked by WEW to hold that, inasmuch as the discrimination against Crum and Purnell was solely or primarily attributable to the action of the respondent unions, the Board erred in directing that WEW, jointly and severally with Local and ILWU, make whole Crum and Purnell for loss of pay suffered as a result of the discrimination. It is argued that respondent unions should be held solely liable for back pay. Our recent case of National Labor Relations Board v. Pinkerton's National Detective Agency, 9 Cir., 202 F.2d 230, is squarely opposed to this contention, and we adhere to the rationale of that decision.

## II

Each of the respondents contends that certain of the allegations of the Board's complaint were improper because not founded upon charges filed with the Board within 6 months following the violations alleged, as required by § 10(b) of the Act. In approaching these questions it will be well to bear in mind a number of well-settled general principles.

██ A *charge* is not a pleading; it simply sets in motion the investigative machinery of the Board. National Labor Relations Board v. Kobritz, 1 Cir., 193 F.2d 8; Cusano v. National Labor Relations Board, 3 Cir., 190 F.2d 898; National Labor Relations Board v. King-

ston Cake Co., 3 Cir., 191 F.2d 563; National Labor Relations Board v. Westex Boot & Shoe Co., 5 Cir., 190 F.2d 12; Kansas Milling Co. v. National Labor Relations Board, 10 Cir., 185 F.2d 413. The charge has served its purpose when the Board's investigation is begun. Kansas Milling Co. v. National Labor Relations Board, supra. It is only when the Board, after investigation of the charges filed with it, has issued its *complaint* that the precise issues in the case are framed. National Labor Relations Board v. Westex Boot & Shoe Co., supra. The *charge* has one additional function: it informs the alleged violator of the general nature of the grievance against him; the requirement of § 10(b) of the Act that the charge be filed within 6 months after the event was designed to give alleged violators opportunity to prepare defenses and to protect them against stale claims. See Cusano v. National Labor Relations Board, supra; National Labor Relations Board v. Gaynor News Co., 2 Cir., 197 F. 2d 719, affirmed *sub nom.* Radio Officers' Union of Commercial Telegraphers Union v. National Labor Relations Board, 347 U.S. 17, 74 S.Ct. 323. Since these are the only functions of the *charge,* and because charges must often be prepared by persons without knowledge of pleading or the laws, the Board has wide leeway in including in its *complaint* allegations of facts unearthed in its investigation of a timely charge filed with it, even though such facts were not specifically mentioned in the charge. National Labor Relations Board v. Martin, 9 Cir., 207 F.2d 655; National Labor Relations Board v. Gaynor News Co., supra; Kansas Milling Co. v. National Labor Relations Board, supra. The limitation on this power of the Board is that the new matter, if incorporated in the complaint more than 6 months after the events occurred, must not be so dissociated or remote from the allegations of the charge as to prejudice the alleged violator in preparing his case. See Cusano v. National Labor Relations Board, supra; National Labor Relations Board v. Gaynor News Co., supra.

Respondent WEW objects to so much of the Board's complaint as relates (1) to the execution of the Coast Agreement and (2) to the execution of the Dock Agreement. Local objects to the complaint's allegation that Local discriminatorily refused dispatch to Crum, and ILWU objects to the allegation that it discriminatorily refused dispatch to Purnell.

█ With reference to WEW's first contention the facts are these. On or about *November 25, 1948*, during negotiations to halt a strike, substantial *oral agreement* was reached on the terms of the Coast Agreement. The Coast Agreement became effective on *December 6, 1948*, when the strike ended. The *written Agreement*, however, was first "initialed" for and on behalf of the parties, of whom WEW was one, on *December 17, 1948*. The first charge against WEW was filed by Crum on *June 14, 1949*, and alleged the preferential hiring provisions of the *Coast Agreement*. The Trial examiner, in his findings, and the Board, in an amendment to its decision and order, took *December 17, 1948* as the date of "execution" of the Coast Agreement and, accordingly, found that Crum's charge of June 14, 1949 was filed within the prescribed 6-month period. We find no error in this determination. The Coast Agreement was initialed and thereby "executed" on December 17, 1948.

█ The Dock Agreement was executed on *February 26, 1949*. The *charge* filed by Crum on *June 14, 1949* did not mention the Dock Agreement. The first reference to that agreement was contained in the first amended charge filed by Purnell on *September 21, 1949*—more than 6 months after the execution of this Agreement. But the *charge* filed by Crum on June 14, 1949 did allege that WEW contributed to the support of a hiring hall of which only ILWU members had use, and that Crum had been refused dispatch from the Seattle hiring hall on account of nonpayment of a fine. The Dock Agreement was but a supplementary agreement under which the discriminatory dispatch and employment of persons through the Seattle hiring hall were carried out. By alleging the execution and enforcement of this Agreement the Board's complaint merely added detail to a picture imperfectly drawn in the charge filed by Crum on June 14, 1949, and we therefore conclude that the allegation was proper. Cf. Kansas Milling Co. v. National Labor Relations Board, supra; National Labor Relations Board v. Kingston Cake Co., supra.

█ Moreover, WEW's enforcement of the Dock and Coast Agreements continued to the time Crum's charge of June 14, 1949 was filed, and such enforcement was in itself a sufficient basis for the Board's order prohibiting WEW from giving effect to the unlawful portions of those agreements, and from renewing, extending or entering into any like or related agreement. Katz v. National Labor Relations Board, 9 Cir., 196 F.2d 411; National Labor Relations Board v. Gaynor News Co., supra.

The contentions of ILWU and Local will be taken up together. Crum was refused dispatch by the hiring hall on or about *January 27, 1949*. Purnell was refused dispatch on or about *February 3, 1949*. Purnell filed a charge against *Local only* on *February 21, 1949*, alleging the operation by Local of an illegal hiring hall and the refusal to dispatch him. *Crum* filed a charge against *ILWU only* on *June 14, 1949*, alleging the operation by the ILWU, jointly with the employers, of the hiring hall and, pursuant to the unlawful hiring preference provisions of the Coast Agreement, a refusal by ILWU to authorize his employment. In an amended charge filed on *November 30, 1950* against *both Local and ILWU* Purnell charged discrimination against *both himself and Crum*. And in an amended charge filed *December 1, 1950*, against *both Local and ILWU*, Crum charged discrimination against *both himself and Purnell*. Both of the mentioned amended charges, it will be noted, were filed more than 6 months after the refusals to dispatch.

ILWU contends that no timely charge was filed against it as regards the refusal to dispatch *Purnell*, and that so much of the complaint as alleged such refusal should therefore have been dismissed as to ILWU. Local contends that no timely charge was filed against it as regards the refusal to dispatch *Crum*, and that so much of the complaint as alleged such refusal should therefore have been dismissed as to *Local*. The Trial Examiner agreed with these contentions, but was overruled by the Board.

 We think the Board was correct. The charge filed by Purnell against *Local* on February 21, 1949 was a sufficient basis for the complaint's allegation that *Local* wrongfully refused dispatch to both *Purnell and Crum*. Similarly, the charge filed by Crum against *ILWU* on June 14, 1949 was a sufficient basis for the complaint's allegation that *ILWU* wrongfully refused dispatch to both *Crum and Purnell*. In each case the charge alleged the illegal hiring hall arrangement, and alleged particular discrimination as against the person who filed the charge. Each *charge* furnished the basis for a *complaint* alleging not only the particular discrimination stated in the charge, but also for allegations of other instances of discrimination effected pursuant to the same unlawful hiring hall scheme or arrangement, provided such other instances themselves occurred within 6 months prior to the filing of the charge, as was the case here. As the Court said in National Labor Relations Board v. Gaynor News Co., supra, 197 F.2d at page 721, 722, affirmed 347 U.S. 17 at page 34, n. 30, 74 S.Ct. 323, with reference to a similar problem: "Here the violation and the facts constituting it remained the same as in the original charge; only the number of those discriminated against was altered. This addition certainly could not prejudice the employer's preparation of his case, or mislead him as to what exactly he was being charged with." To substantially the same effect are Kansas Milling Co. v. National Labor Relations Board, supra, and National Labor Re-

lations Board v. United States Gypsum Co., 5 Cir., 206 F.2d 410. We conclude, then, that the charges filed by Crum and Purnell were an adequate foundation for the portions of the complaint attacked by Local and ILWU.

The Board's Order will be enforced.